72 P.3d 226 (2003)
117 Wash.App. 462
STATE of Washington, Respondent,
v.
A.G., b.d. 09-07-84, Appellant.
No. 50031-7-I.
Court of Appeals of Washington, Division 1.
July 7, 2003.
*227 Elaine L. Winters, Washington Appellate Project, Seattle, WA, for Appellant.
Ian Michael Goodhew, King County Prosecutor's Office, Seattle, WA, for Respondent.

PUBLISHED IN PART
AGID, J.
A.G. appeals her vehicular homicide and reckless endangerment convictions arising from a fatal one-car accident. She argues her three reckless endangerment convictions violate her constitutional right to be free from double jeopardy. Because the plain and unambiguous language of the reckless endangerment statute provides that a defendant is guilty of the crime if she creates a risk to a particular person and three people were in A.G.'s vehicle when the accident happened, the State could properly charge her with three counts of reckless endangerment.
A.G. also contends the juvenile court's finding that she did not have actual knowledge of the specific risks created by her driving precludes its conclusion that she satisfied the mental elements of the offenses. She also asserts the court's finding that a reasonable person in her situation would have understood the risks of her driving is not supported by the evidence. But the evidence established that A.G. understood the risks of speeding, recklessness and inattentive driving, and a driver need only understand these general risks to satisfy the mental elements of reckless endangerment and vehicular homicide. We therefore affirm her convictions.

FACTS
On March 16, 2001, A.G. decided to skip afternoon classes at Vashon High School and drive to her house for lunch. A.G.'s boyfriend, Thomas Porro, gave A.G. and Katie Boss a ride to the Vashon Island ferry dock so A.G. could take her father's car. A.G. had gotten her driver's license 20 days earlier. The two girls then drove back to school, picked up their friend Sydney Shelton, and drove to the store to buy lunch. A.G. and the other girls ran into Porro, who was notorious throughout the high school for his fast and reckless driving. In their respective cars, Porro and A.G. began playing a game, and A.G. tried to follow him as he sped down the road. At one point, A.G. was going 90 mph while she tried to keep up with him.
After they lost Porro, A.G. and the other girls returned to the high school to ask Jake Wittmier to join them for lunch. Wittmier was with Ashley Fix when Shelton invited him to join them. Shelton asked Fix to join them and, although she was hesitant at first, Fix agreed to go with them. Boss told A.G. it was a bad idea to take another person because the car did not have enough seat belts, but A.G. told her it would be okay. Wittmier got into the back of the car and sat behind Boss, who sat in the front passenger's seat. Fix sat in the middle of the back, and Shelton sat behind A.G. Wittmier and Shelton did not wear their seat belts, and the car did not have a seatbelt for a third person sitting in the middle of the back seat.
A.G. then drove from the cement parking lot over to a nearby gravel parking lot even though she did not need to go through the gravel lot to leave the school parking lot. She did a "brodie" in the gravel by whipping the car around in a circle while accelerating. High school counselor Judith Vondal heard A.G.'s car spin around in the gravel, and she watched as A.G. drove out of the gravel onto the cement to leave the school lot. Vondal saw her accelerate out of the exit, causing the back end of the car to fishtail out of control.
A.G. turned onto 204th Street. As she drove past Shelton's home, Shelton noticed the speedometer was at 60 mph. She was nervous about the speed and thought about telling A.G. to slow down, but she did not. A.G. then turned onto Monument Road and again accelerated. Wittmier noticed the speedometer needle pointing straight up, which meant A.G. was going 80 mph. Vashon resident Terry Campbell was jogging on Monument Road when he heard a car approaching. He testified that he moved further off the roadway because the car was moving at an abnormally high rate of speed.
As A.G. drove down a straight stretch of Monument Road with a 40 mph speed limit, *228 she began "playing around" with the wheel by swerving the car back and forth and told the passengers, "Look, guys, I can drive like Thomas," her boyfriend. At the same time, A.G. stopped looking at the road and looked down to adjust the stereo.
As she swerved back and forth and looked at the stereo, the car drifted into the oncoming lane. She jerked the wheel to the right so hard that she swerved back across her lane of travel into the gravel on the side of the road. She then jerked the wheel back to the left and slammed on the brakes. The car went back into the opposite lane and then into a ditch, causing it to roll. It continued moving down the ditch, facing almost 180 degrees in the opposite direction from its original direction of travel. It then hit a clump of small trees, broke through them and continued down the ditch. The car finally struck a bank, jumped up over a fire hydrant and came to a stop 407 feet from the point where the tires started to leave skid marks on the roadway. During the skid, Fix, Wittmier, and Shelton were ejected from the back of the vehicle. Fix landed approximately 30 feet from the vehicle and died almost immediately.
After the car came to a stop, A.G. exclaimed, "oh shit." She told Boss she was sorry and asked her to make up a lie so A.G. could avoid getting in trouble with her father. Several passing motorists stopped at the crash site. Mike Fortin, one of their classmates, stopped and asked what happened. Boss and Shelton told him A.G. had been driving faster than the speed limit and both made a motion with their hands indicating she had been playing with the steering wheel.
King County Sheriff's Deputy Chris Kahrs responded to the accident. A.G. told him, "it was my fault" and "I was driving too fast." King County Detective Steve Hager arrived at the scene of the crash and began to reconstruct the events. He observed dry road conditions, a straight, slightly downhill roadway with wide shoulders, and an overcast sky. Based on the length of the skid marks and other mathematical calculations, Detective Hager estimated the car's speed at the beginning of the crash at 78-79 mph.
At trial, Shelton testified that she took a driver's education course with A.G. before the crash. In the class, A.G. learned about cautious driving, obeying the speed limit, obeying the laws of the road, and being responsible for passengers. She also learned about losing control of a vehicle at high speeds, the dangers of "messing around" in the car while driving and what to do when the brakes lock up.
A.G. testified in her own defense. She admitted to learning in driver's education about losing control of a vehicle and testified that she learned what to do in those circumstances. She told the court she learned the importance of obeying the speed limit so she could control the vehicle and safely bring it to a stop. She said she learned not to slam on the brakes in certain situations, but to apply light pressure to ease the vehicle back under control. She also admitted that she followed Porro on the day of the crash and that they had broken the speed limit. She testified that Porro was a "crazy," reckless driver whose driving had scared her when she had ridden with him in the past.
Dick Chapman, an accident reconstruction consultant, testified on A.G.'s behalf. He agreed with Detective Hager's speed estimate of 78-79 mph. He also testified that a driver would need specific knowledge, training and experience in order to regain control of a vehicle at the speed A.G. was traveling.
Dr. Marty Beyer, a child psychologist, also testified for A.G. She said A.G. was not aware of the risks of her driving because of past trauma in her life and her lack of maturity. Dr. Beyer acknowledged that A.G. told her about "fooling around" with the wheel before the crash and telling the others that she was driving like Thomas. Dr. Beyer also admitted the defendant knew the danger of playing around while driving.
On July 12, 2001, the King County Prosecutor's Office charged A.G. with one count of vehicular homicide based on the death of Ashley Fix. On December 4, 2001, the State amended the information to add three reckless endangerment counts. A.G. was tried in juvenile court. The court found her guilty on all four counts. A.G. appeals.

*229 DISCUSSION

I. Double Jeopardy
A.G. contends that charging her with three counts of reckless endangerment violates double jeopardy. While she did not raise this issue at trial, a constitutional challenge may be raised for the first time on appeal.[1] The double jeopardy clause of the Fifth Amendment protects a defendant from being punished more than once for the same offense.[2] To decide whether the clause was violated, the court normally applies the "same evidence" test[3] to determine whether the defendant has been convicted of offenses which are the same in law and in fact.[4] But when a defendant is convicted of violating a single statute multiple times,[5] as is the case here, the defendant cannot satisfy the same evidence test because the evidence is necessarily different for each count. Therefore, the proper inquiry is what "unit of prosecution" the Legislature intended as the punishable act under the specific statute.[6] The first step in analyzing the unit of prosecution is to examine the statute.[7]
RCW 9A.36.050(1) provides that "[a] person is guilty of reckless endangerment when he or she recklessly engages in conduct not amounting to drive-by shooting but that creates a substantial risk of death or serious physical injury to another person."[8] A.G. asserts she was convicted of three counts of reckless endangerment based on the same automobile accident, and that the unit of prosecution for this offense is the defendant's reckless conduct. Washington courts have not yet determined the unit of prosecution for reckless endangerment.
A.G. cites State v. Westling in support of her argument.[9] There, the defendant was convicted of three counts of second degree arson after setting a single fire that damaged three automobiles. The charging statute, RCW 9A.48.030(1), provides that
[a] person is guilty of arson in the second degree if he knowingly and maliciously causes a fire or explosion which damages a building, or any structure or erection appurtenant to or joining any building, or any wharf, dock, machine, engine, automobile, or other motor vehicle, watercraft, aircraft, bridge, or trestle, or hay, grain, crop, or timber, whether cut or standing or any range land, or pasture land, or any fence, or any lumber, shingle, or other timber products, or any property.[[10]]
The Washington Supreme Court held that the unit of prosecution for second degree arson is the act of setting a fire, not each piece of damaged property. Thus, according to A.G., like the one fire set in Westling, her conduct caused one automobile accident that endangered three passengers. But this statute is significantly different from the one involved in Westling. The reckless endangerment statute clearly predicates guilt on the defendant's creating a risk to a single particular person. Unlike the arson statute, the statute under which A.G. was charged focuses on the single individual whose well-being is put in jeopardy by whatever conduct the defendant engages in.
And unlike the arson statute, RCW 9A.36.050(1) does not address creating risk of harm to a group of people or things. A person commits the crime by creating a risk in relation to another person. A.G. fails to establish that the language of this statute is *230 unclear or ambiguous, and a court is "not obliged to find an ambiguity by imagining a variety of alternative interpretations."[11] We therefore conclude the Legislature intended one unit of prosecution per victim. Because the statute predicates guilt on creating a risk to a single person and A.G.'s conduct endangered three different people who were in her car at the time, the State could charge her with three counts of reckless endangerment and not violate the double jeopardy clause.[12] We therefore decline to dismiss two of the three counts.
The remainder of this opinion has no precedential value. Therefore, it will not be published but has been filed for public record. See RCW 2.06.040; CAR 14.
COX and SCHINDLER, JJ., concur.
NOTES
[1] RAP 2.5(a).
[2] State v. Gocken, 127 Wash.2d 95, 100, 896 P.2d 1267 (1995).
[3] State v. Calle, 125 Wash.2d 769, 777, 888 P.2d 155 (1995).
[4] Id. at 777-78, 888 P.2d 155.
[5] State v. Adel, 136 Wash.2d 629, 633, 965 P.2d 1072 (1998).
[6] Id. at 634, 965 P.2d 1072.
[7] Id. at 635, 965 P.2d 1072.
[8] (Emphasis added.)
[9] 145 Wash.2d 607, 610, 40 P.3d 669 (2002). A.G.'s reply brief attempts to analogize to additional cases. These cases provide no more elucidation than Westling. In addition, A.G. fails to state or cite to the relevant statutes in those cases. We need not consider the argument. RAP 10.3(a)(5).
[10] (Emphasis added.)
[11] McFreeze Corp. v. State Dept. of Revenue, 102 Wash.App. 196, 200, 6 P.3d 1187 (2000) (citing State v. Tili, 139 Wash.2d 107, 115, 985 P.2d 365 (1999)).
[12] There were, of course, four passengers. The fourth died and is the basis of the vehicular homicide conviction.